

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| DR. T., NURSE T., HOSP. CLERK M., DR. J., and HEALTH UNIT COORDINATOR L., CUSTODIAN S., TECHNICIAN H., AND NURSE R.<br><br>      Plaintiffs,<br><br>      v.<br><br>NICOLE ALEXANDER-SCOTT, in her official capacity as Director of the Rhode Island Department of Health, and DANIEL J. MCKEE in his official capacity as Governor of the State of Rhode Island,<br><br>      Defendants. | C.A. No. 1:21-cv-00387-MSM-LDA |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

## I.    INTRODUCTION

The Court now considers the plaintiffs' Motion for a Preliminary Injunction (ECF No. 2) on an expanded record, having previously denied their request for a temporary restraining order.

The plaintiffs, all health care workers, seek injunctive relief against the enforcement of Rhode Island Department of Health ("RIDOH") Emergency Regulation 216-RICR-20-15-8, ("Regulation") promulgated August 17, 2021, which requires all healthcare workers, except those meeting a very narrow medical exception, to be vaccinated against COVID-19 by October 1, 2021.  The plaintiffs

claim that, because this Regulation does not include an opportunity for a healthcare worker to obtain a religious exemption to vaccination, it violates the United States Constitution and Title VII of the Civil Rights Act of 1964.

The plaintiffs ask the Court to enjoin the RIDOH from enforcing any requirement that employers deny religious exemptions from COVID-19 vaccination or that they revoke any exemptions employers already granted before the Regulation; that the RIDOH be barred from interfering with the granting of religious exemptions going forward; and from taking any disciplinary action against the plaintiffs for seeking or having obtained a religious exemption.

For the following reasons, the Court DENIES the plaintiffs' Motion.

## II.   BACKGROUND

All findings of facts are based upon the affidavits and other exhibits provided by the parties. The Court is aware of news reports that, in light of the rapidly spreading Omicron variant of COVID-19 and the everchanging nature of the pandemic, the RIDOH has issued new guidance allowing for the possibility of certain COVID-19 positive healthcare workers to work at a healthcare facility if it is determined that the facility is facing a crisis-level staffing shortage. No parties, however, have sought to reopen or supplement the record since this RIDOH announcement or to otherwise argue how it may support their position. The Court will therefore proceed to consider the plaintiffs' motion on the existing record, which is as follows.

Since early 2020, the SARS-CoV-2 virus responsible for the COVID-19 disease

has spread across the world causing a global health emergency.  At the time of the parties' submissions, COVID-19 and/or its variants has caused the deaths of over 2,700 Rhode Islanders; more than 650,000 Americans, and upwards of 4.4 million people worldwide.  (ECF No. 16-2, Affidavit of Dr. James McDonald ("McDonald Affidavit") ¶ 9.[1]  At the time of this writing, those numbers have grown significantly.

In mid-December 2020, after a year of public health mitigation measures such as social distancing, quarantining, mask wearing, the U.S. Food and Drug Administration authorized vaccines for emergency use.  *Id.* ¶ 22.   On January 21, 2021, about a month after the COVID-19 vaccines became available, Rhode Island had a 7-day percent positive rate of 5.0% (which was down from 6.6% the previous week), but its average of 201.6 daily cases per 100,000 people in the last seven days was the second highest in the United States. *Id.* ¶ 29. Approximately two months later, on March 17, 2021, Rhode Island's seven-day percent positive rate decreased to 2.0%. *Id.* ¶ 30. The Director of the RIDOH, Dr. Nicole Alexander-Scott, affirms to "a reasonable degree of medical certainty, vaccination was the primary reason for this decrease." (ECF No. 16-1, Affidavit of Dr. Nicole Alexander-Scott ("Alexander-Scott Affidavit") ¶ 29.)

On January 1, 2021, Rhode Island had 776 positive COVID-19 cases, and 452 people hospitalized with COVID-19. McDonald Affidavit ¶ 31a. By May 1, 2021, Rhode Island had 175 positive COVID-19 cases, and 139 COVID-19 hospitalizations;

---

[1] James McDonald, MD, MPH, serves as the Medical Director of the RIDOH's COVID Unit.

by June 1, 2021, positive COVID-19 cases dropped to 42 and hospitalizations dropped to 47; and by July 1, 2021, COVID-19 cases decreased to 24 and hospitalizations dropped to 23. *Id.* ¶ 31. But this general downward trend that Rhode Island and much of the United States experienced during the first seven months of 2021 halted in August. *Id.* ¶ 32. By August 1, 2021, the number of COVID-19 positive cases increased to 90 and hospitalizations increased to 46; by August 15, 2021, COVID-19 positive cases climbed to 162 and hospitalizations to 102; and by August 26, 2021, COVID-19 positive cases reach 337 and hospitalizations 127. *Id.* ¶ 32.

Health care services have been particularly affected. Scientific research shows health care workers have higher rates of infection than people in other fields. Alexander-Scott Affidavit ¶ 15. With heath care workers having higher rates of infection, it follows that patients interacting with them have a threefold increased risk of COVID-19, and the household members of patients interacting with health care professionals have a twofold increased risk of COVID-19. *Id.* ¶ 16. As of October 11, 2021, according to the CDC, 596,027 health care personnel in the United States have contracted COVID-19 and 1,939 have died. *Id.* The CDC has recommended that all health care personnel receive the COVID-19 vaccine, since they "continue to be on the front line of the nation's fight against COVID-19" by "providing critical care to those who are or might be infected with the virus that causes COVID-19." *Id.* ¶ 19.

SARS-CoV-2, like other viruses, mutates over time. McDonald Affidavit ¶ 15. These mutations change the properties of the original strain and affect the ability of the virus to be transmitted from person to person and how virulent (or deadly) the

virus may be. *Id.* By early August 2021—the same time as the number of positive cases and hospitalizations began to rise—SARS-CoV-2 had mutated to form what is known as the Delta variant which has become the dominant strain in Rhode Island and the United States.[2] *Id.* ¶ 17. Patients with the Delta variant may have a viral load over 1,000 times higher than the original SARS-CoV-2 strain, meaning such patients have over 1,000 times more copies of the virus within them as compared to the original strain. *Id.* Medical and scientific journals have also reported that the Delta variant is 6 to 8 times more contagious than the original strain, and therefore, more likely to cause infections even in fully vaccinated individuals. *Id.* Notably, however, infections are even more likely, with more serious health consequences, in unvaccinated persons. *Id.*

Based on these factors and statistics, as well as the upward trend in COVID-19 cases and hospitalizations, on August 17, 2021, the RIDOH promulgated the Regulation at issue. Specifically, it required all "health care workers" and all "health care providers" to be vaccinated against COVID-19 by October 1, 2021, except those with a medical exemption. 216-RICR-20-15-8.

Two days later, on August 19, 2021, Governor Daniel J. McKee further responded to the increased cases and hospitalizations caused by the Delta variant by declaring a state of emergency. Governor Daniel J. McKee, Executive Order 21-86, Aug. 19, 2021, available at https://governor.ri.gov/executive-orders/executive-order-

---

[2] As noted above, these are the facts as they exist in the record before the Court. As of the writing of this opinion information that is available seems to indicate that Omicron, and not Delta, is currently the predominant variant in the United States.

21- 86.  The Declaration of Disaster Emergency was punctuated by various findings, including that hospitals' emergency departments were exceeding capacity; that hospitalizations and deaths have consistently increased since July 4, 2021; and that a field hospital in Cranston would be reopened to accommodate the possible surge caused by the Delta variant. *Id.*

It noteworthy that while the Regulation, 216-RICR-20-15-8, was new, the requirement that health care workers vaccinate against known diseases preexists the COVID-19 pandemic.  In 2002, RIDOH promulgated Regulation 216-RICR-20-15-7, entitled "Immunization, Testing, and Health Screening for Health Care Workers." This regulation requires evidence of immunity for health care workers for Measles, Mumps, Rubella, Varicella (chickenpox), Tetanus, Diphtheria, Pertussis, and Tuberculosis.  Accordingly, to work as a health care worker in Rhode Island, a health care worker must have immunity from these diseases. Like the COVID-19 vaccine, only a medical exemption is expressed in 216-RICR-20-15-7, and like COVID-19, the purpose of 216-RICR20-15-7 is not only to protect health care workers but also people being treated by health care workers, and the broader community.  Alexander-Scott Affidavit ¶ 12.  As such, Rhode Island has a history of requiring vaccinations for its health care workers, without a religious exception.

In deciding to issue the Regulation, the RIDOH determined that reducing the number of unvaccinated personnel who can expose vulnerable patients to a potentially deadly disease in the health care setting is of utmost importance. McDonald Affidavit ¶ 47.  In the fall and winter seasons, during which the weather

becomes colder, and people gather indoors, the likelihood of spread of the highly contagious Delta variant increases. Alexander-Scott Affidavit ¶ 22. Additionally, as cold and flu season has arrived, the varying symptoms of COVID-19 (e.g., cough, fever, fatigue, muscle or body aches, headache, sore throat, congestion or runny nose, among others) could easily be mistaken for a cold or the flu. *Id.*

The RIDOH's central goal of the Regulation is to permit only vaccinated professionals near patients. *Id.* ¶ 13a. "This purpose is important because health care facilities treat and provide care for persons who are vulnerable due to their health conditions, some of whom themselves are unprotected by vaccination." *Id.* Importantly, "more traditional non-pharmaceutical measures intended to prevent spread and protect patients and workers, such as masking and social distancing, may not always be possible because of the nature of health care services provided." *Id.* Additionally, a vaccinated health care worker will have a lower viral load, making he or she less likely to transmit COVID-19 to the patient. *Id.*

Another consideration: "health care workers and health care providers who are not vaccinated are more likely to become sick with COVID-19." *Id.* ¶ 13b. This would result in a reduction of the work force necessary to provide quality care. *Id.*

In considering the Regulation, DOH officials also considered less restrictive means to achieve its goals. As related by Dr. Alexander-Scott, for instance:

> RIDOH also considered whether certain non-pharmaceutical measures, such as masking and testing, would have achieved the purpose of the Regulation, but RIDOH also rejected this alternative. Specifically, while testing might alert a facility that it has a health care worker within its facility that is positive for COVID-19, RIDOH's objective is, to the greatest extent possible, to keep COVID-19 positive persons out of health care facilities. An unvaccinated

person who tests positive for COVID-19 could have been within a health care facility for days before being alerted to the positive test. During this period of time, these persons could be spreaders of the COVID-19 virus, and this is particularly problematic concerning the increased transmission of the Delta variant. Wearing masks does provide some protection against the spread of COVID-19 and RIDOH considered this alternative to vaccination, however this alternative was rejected since vaccination is a superior alternative to masking. This is supported by the extensive data and evidence regarding the efficacy of vaccines. … Importantly, only vaccination—not masking or testing—provides continued protection against contracting COVID-19 twenty-four hours a day, seven days a week. While less than one percent of health care workers and health care providers may be unvaccinated and wearing masks, increasing this number would hinder the RIDOH purpose. Allowing more people to remain unvaccinated, but wear masks, would also create enforcement issues similar to what has been seen in society. For example, in many cases it would be difficult if not impossible to know who is vaccinated and who is not vaccinated. Without knowing who was vaccinated, it would be impossible to enforce a mask-wearing requirement.

Additionally, RIDOH's goal is to achieve herd immunity in Rhode Island. It is estimated that herd immunity will be reached at 97% of the total population. Currently, approximately 69% of the total Rhode Island population is vaccinated. The only way to achieve this goal is through vaccination. Additionally, scientific evidence and data exists that vaccination is the best counter-measure against contracting and spreading COVID-19. For instance, as explained in Dr. McDonald's affidavit, during the period from January 2021 to early July 2021, the rate of positive COVID-19 cases and hospitalizations generally declined. During much of this period of time – and for many months before this period of time – Rhode Islanders were required to wear masks when indoors. However, it was not until vaccinations began in mid-December 2020 that Rhode Island began to see a significant decrease in the number of positive cases and hospitalizations. While this decrease may have been affected by many variables, based upon my review of the studies and data, it is my opinion to a reasonable degree of medical certainty, that this decrease was primarily due to vaccination. Dr. McDonald's affidavit references other studies supporting the conclusion that vaccination is the most effective measure to prevent the spread and contraction of COVID-19. *See* McDonald Affidavit ¶¶ 22, 23. Even when the indoor mask requirement was lifted in May 2021, positive cases and hospitalizations continued to decrease until the Delta variant became the dominant strain in Rhode Island in July 2021. *See* McDonald Affidavit ¶ 28. To a reasonable degree of medical certainty, vaccination was the primary reason for this decrease.

Alexander-Scott Affidavit, ¶ 28-29.

The RIDOH considered, too, that studies have demonstrated that previous COVID-19 infection has not shown to be as effective at preventing the disease than vaccination. *Id.* ¶ 22.

The only exception from the vaccine requirement expressed in the Regulation is a defined medical exemption.  Medically exempt individuals must comply with certain masking and testing requirements set forth in the Regulation.  Importantly, the medical exemption itself is narrow, stating:

> [a] health care worker or health care provider shall be medically exempt from being required to be vaccinated provided that a licensed physician, physician assistant or advanced practice registered nurse signs a medical exemption stating that the health care worker or health care provider is exempt from the COVID-19 vaccine because of medical reasons in accordance with Advisory Committee on Immunization Practices (ACIP) guidelines and determined as acceptable by the facility.

The Regulation's medical exemption does not allow a person to claim any medical exemption they see fit, but rather is limited to only five enumerated medical contraindications, which must be verified by a medical provider. The first four are consistent with manufacturer warnings, the last, is consistent with Centers for Disease Control guidance.

The five medical contraindications available are:

1. Severe allergic reaction (e.g., anaphylaxis) after previous dose or to a component of the vaccine;

2. Immediate allergic reaction of any severity after a previous dose or known (diagnosed) allergy to a component of the vaccine;

3. History of myocarditis or pericarditis after a first does of an mRNA COVID-

19 vaccine;

4. History of myocarditis or pericarditis unrelated to mRNA COVID-19 vaccination; and

5. Monoclonal Antibody Treatment (MABS) within the 90 days prior to October 1, 2021 (healthcare worker should get vaccinated no later than 91 to 120 days after MABS).

Each of these medical contraindications lasts only as long as the medical conditions exists and the fifth medical contraindication sunset on December 30, 2021. Thereafter, only four medical contraindications are available. *See* Alexander-Scott Affidavit ¶ 5 ("In order to ensure that an many health care workers and health care providers as possible are vaccinated, the 'medical exemption' is limited only to the enumerated contraindications and extends only to those in whom the vaccine poses a serious threat to their own health, including the risk of death, as determined by a medical provider.").

At the time of briefing in this matter, with 81% of health care facilities reporting, out of the 61,016 health care workers RIDOH is aware of, 57,757 have been vaccinated and 365 are subject to a medical exemption. *Id.* That is, only 0.59% of health care workers have a valid medical exemption. *Id.* ¶ 8.

Dr. Alexander-Scott explains the RIDOH reasoning for including only a limited medical exemption:

"Allowing exemptions other than the limited medical exemption permitted, would defeat RIDOH's purpose in promulgating the Regulation, which is to ensure as best as possible the continued health and well-being of health care workers and health care providers, as well as those treated by health care

10

workers and health care providers, as the COVID-19 pandemic continues." Alexander-Scott Affidavit ¶ 9.

RIDOH's goal of achieving herd immunity also would also be set-back. *Id.* ¶ 28.

While the Regulation contains no other exemptions, Dr. Alexander-Scott states that it "is not intended to bar employers from considering requests from employees who religious or other accommodations, and employers who receive a religious exemption request should act in conformity with applicable state and federal law." *Id.* ¶ 14. Unvaccinated health care workers without a medical exemption, however, are not allowed to enter a health care facility. *Id.* But "RIDOH would expect the employer to … consider alternative work-conditions, such as telemedicine…." *Id.*

The plaintiffs provided a November 3, 2021, Notice of Violation and Compliance Order to a health care facility with some unvaccinated persons in the facility, some claiming religious exemptions. (ECF No. 20.) In response, the health care facility placed an employee on administrative leave because his or her job could not be performed remotely. *Id.*

### III.   PRELIMINARY INJUNCTION STANDARD

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). Of these factors, "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary

injunction calculus." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). "If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Me. Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012). The Court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless the plaintiffs meet their burden of persuasion with "substantial proof." *Marzurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L.Ed.2d 162 (1997).

## IV.   DISCUSSION

Courts in this country have held for over a century that mandatory vaccination laws are a valid exercise of a state's police powers, and such laws have withstood constitutional challenges. *See, e.g.*, *Employment Div., Dep't of Human Res. Of Ore. v. Smith*, 494 U.S. 872, 889 (1990) (identifying "compulsory vaccination laws" as among the neutral, generally applicable laws that did not require religious exemptions under the First Amendment); *Prince v. Massachusetts*, 321 U.S. 158, 166-67, n.12 (1944) (noting that the right to practice one's religion freely "does not include liberty to expose the community … to communicable disease"); *Zucht v. King*, 260 U.S. 174, 176-77 (1922) (holding that there was no equal protection violation where child prohibited from attending school without vaccinations, and explaining that "in the exercise of the police power reasonable classification may be freely applied, and that regulation is not violative of the equal protection clause merely because it is not all- embracing"); *Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905) (holding that mandatory vaccination laws do not offend "any right given or secured by the

Constitution," and that a state's police power allows imposition of "restraints to which every person is necessarily subject for the common good"). *See also Does 1-6 v. Mills*, No. 1:21-cv-00242, 2021 WL 4783626, *6 n.12 (D. Me. Oct. 13, 2021) (citing, *inter alia, Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"); *Workman v. Mingo Cnty. Bd. Of Educ.*, 419 Fed. App'x 348, 352-54 (4th Cir. 2011) (relying on the *Jacobson, Zucht,* and *Prince* line of cases to hold that a state mandatory vaccination law that allowed medical but not religious exemptions was constitutional); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1084, 1086 (S.D. Cal. 2016) ("[I]t is clear that the Constitution does not require the provision of a religious exemption to vaccination requirements" because, "[a]s stated in *Prince*, the right to free exercise does not outweigh the State's interest in public health and safety.").

With this background, the Court now considers the Regulation under the jurisprudence interpreting the Free Exercise Clause of the First Amendment to the United States Constitution.

## A. Free Exercise Clause

"The First Amendment's Free Exercise Clause, as incorporated against the states by the Fourteenth Amendment, protects religious liberty against government interferences." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940)). "When a religiously neutral and generally applicable law incidentally burdens free exercise rights, we will sustain the law against constitutional challenge if it is rationally related to a legitimate government

interest." *Id.* (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021)). "When a law is not neutral or generally applicable, however, we may sustain it only if it is narrowly tailored to achieve compelling governmental interest." *Id.* (citing *Fulton*, 141 S. Ct. at 1881).

A law is not neutral if it "single[s] out religion or religious practices" or "restricts practices because of their religious nature." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532-534 (1993); *Fulton*, 141 S. Ct. at 1877. And "[t]o be generally applicable, a law may not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct." *Id.* (citing *Lukumi*, 508 U.S. at 543). A law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* (quoting *Fulton*, 141 S. Ct. at 1877).

Here, the Regulation is facially neutral. It does not make express (or even implied) reference to religious practice. *Lukumi*, 508 U.S. at 533 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face."). Beyond the Regulation's text, however, it cannot be considered neutral if its object is to discriminate against religious beliefs, practices, or motivations. *Id.* at 534. That is, the Regulation would be violative of the Free Exercise Clause upon a demonstration of "masked" government hostility toward religious belief. *Id.*

There is no evidence this is so. The object of the Regulation is to protect public health and safety by reducing the incidence of COVID-19 and, to do so, it is required

that drastically limit, if not eliminate, unvaccinated persons from health care facilities.  Indeed, the neutrality of the Regulation is further demonstrated by its narrow medical exemption.  It does not allow a healthcare worker to claim any medical exemption; rather, such exceptions are limited to five enumerated contraindications which "would itself cause a serious medical condition as recognized by the manufacturers of the vaccines and/or the CDC."  Alexander-Scott Affidavit ¶ 9.  These specific medical exemptions demonstrate that the object of the Regulation is public health, not to discriminate against religious beliefs or practices.  To require those who may face negative medical outcomes to take the vaccine "would contravene RIDOH's purposes to advance and protect the health and well-being of health care workers, if getting the vaccine would itself cause a serious medical condition as recognized by the manufacturers of the vaccines and/or the CDC."  *Id. See also Jacobson*, 197 U.S. at 39 (holding that "it would be cruel and inhuman in the last degree" to require vaccination "if it is apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death").

Indeed, the Regulation's medical exemption is narrower than that in effect in Maine and recently declared to be constitutional by the First Circuit.  *See Mills*, 16 F.4th at 30.  The Maine exemption is not restricted to specific medical contraindications consistent with vaccine manufacturer warnings or CDC guidance.  Rather, Maine law allows for a "generalized 'medical exemption … available to an

employee who provides a written statement from a licensed physician, nurse practitioner or physician assistant that, in the physician's, nurse practitioner's or physician assistant's professional judgment, immunization … may be medically inadvisable.'" *Id.* (quoting Me. Rev. Stat. tit. 22, § 802(4-B)). *See also Does v. Mills*, 595 U.S. __, __ (2021) (Gorsuch, J., dissenting) (slip op., at 3) (criticizing Maine's law because it may allow for medical exemptions beyond the contraindications specific to the COVID-19 vaccines and does not "limit what may qualify as a valid 'medical' reason to avoid inoculation").

The Regulation also is generally applicable.   It applies to all healthcare workers and does not "require the state government to exercise discretion in evaluating individual requests for exemptions." *Mills*, 16 F.4th at 30.  There is instead a specific, limited exemption based on objective criteria. *See id.*

Further, the Regulation "is generally applicable because it does not permit 'secular conduct that undermines the government's asserted interests in a similar way.'" *Id.* (quoting *Fulton*, 141 S. Ct. at 1877; *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021)).   The Regulation's medical exemption serves the state's principal purpose of protecting public health.   A failure to exempt the limited number of individuals whose health a vaccine may jeopardize would be counterproductive to that goal to the extent of illogicality.  There is no suggestion of a discriminatory bias against religion.

The plaintiffs argue that the Regulation lacks neutrality and general applicability because Rhode Island's law on immunization for any public and private

school includes both a medical and religious exemption. *See* R.I.G.L. § 16-38-2. This is unpersuasive. First, courts consistently have held that a religious exemption is not constitutionally required for mandatory school vaccination requirements. *Does 1-6 v. Mills*, No. 1:21-cv-00242, 2021 WL 4783626, *6 n.12 (D. Me. Oct. 13, 2021) (collecting cases). Indeed, "schools that provided a religious exemption from mandatory vaccination requirements did so *above and beyond* that mandated by the Constitution." *Klaasen v. Trs. of Ind. Univ*, No. 1:21-CV-238, 2021 WL 3073926, at *17-22, *39 (N.D. Ind. July 18, 2021), *aff'd*, 7 F.4th 592 (7th Cir. 2021). Moreover, whether a religious accommodation should be included in an otherwise neutral, generally applicable regulatory law, the Supreme Court has held, is for the political branches of government to decide and not a court upon a Free Exercise challenge. *Emp. Div., Dep't. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 890 (1990) ("[T]o say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weight the social importance of all laws against the centrality of all religious beliefs.")

Here, Rhode Island, through the political process, decided to allow an otherwise constitutionally unrequired religious exemption to vaccine requirements in

schools. But the Court here is not considering schools, it is considering health care workers. In that realm, the RIDOH has been consistent that health care worker vaccination requirements include only a medical exemption. RIDOH's Regulation 216-RICR-20-15-7, promulgated in 2002, requires health care worker immunization for certain communicable diseases and includes no religious exemption. RIDOH has made that same determination with respect to COVID-19 vaccination. This is consistent with RIDOH's purpose to minimize the spread of disease for the sake of public health. The State has presented evidence, and the Court finds, that additional exemptions, including a broader medical exemption, would as Dr. Alexander-Scott puts it, "defeat RIDOH's purpose in promulgating the Regulation, which is to ensure as best as possible the continued health and well-being of health care workers and health care providers, as well as those treated by health care workers and health care providers, as the COVID-19 pandemic continues." Alexander-Scott Affidavit ¶ 9. *See also Mills*, 16 F.4th at 31 ("[P]roviding healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their own health and their ability to provide care.").

The plaintiffs also argue that the Regulation runs afoul of the Supreme Court's holding in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), that a law is not neutral and generally applicable under the Free Exercise Clause if it treats "any comparable secular activity more favorably than religious exercise." 141 S. Ct. 1294, 1296 (2021). "Comparability [for free exercise purposes] is concerned with the *risks* various activities pose, not the reasons why people gather." *Mills*, 16 F.4th at 32 (quoting

*Tandon*, 141 S. Ct. at 1296).  Because the medical exemption requires all healthcare workers to be vaccinated unless vaccination is medically contraindicated, it furthers the state's public health interest.  *Id.*  A religious exemption does not address a risk associated with the Regulation's objectives.  Holding that Maine's vaccine mandate did not run afoul of *Tandon*, the First Circuit offered an analogy: if the Regulation "were an occupancy limit, it would apply to all indoor activities based on facility size, but it would exempt healthcare facilities.  That analogous policy would serve the state's goal of protecting public health, while maximizing the number of residents able to access healthcare and thus minimizing health risks."  *Id.*

Because the Court finds that the Regulation is neutral and of general applicability, rational basis review applies.  "A law survives rational basis review so long as the law is rationally related to a legitimate government interest."  *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).  There is no dispute that reducing the number of unvaccinated healthcare workers who can expose vulnerable patients to a potentially deadly disease is a legitimate government interest.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (holding that promoting the public health by preventing the spread of COVID-19 is "unquestionably a compelling interest").  The Regulation is rationally related to this interest.

For instance, the state has presented credible evidence that vaccination is the best countermeasure against contracting and spreading COVID-19.  Masking and testing alone is insufficient compared to the continued protection of vaccine.  Unvaccinated individuals are more likely to contract and transmit COVID-19 and

suffer serious medical consequences.

Because rational basis review applies and the Regulation passes that test, the Court does not to proceed analyze whether the Regulation would survive a test of strict scrutiny.[3]

## B.  Equal Protection

The plaintiffs also present a claim under the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment but "[w]hen a free exercise challenge fails, any equal protection claims brought on the same grounds are subject only to rational-basis review." *Mills*, 16 F.4th at 35.   Because the plaintiffs are unlikely to succeed on their free exercise claims, they are unlikely to succeed on their equal protection claims. *See id.*

## C.  The Supremacy Clause and Title VII of the Civil Rights Act of 1964

The plaintiffs' also assert that the Regulation compels healthcare facilities to disregard Title VII of the Civil Rights Act and thereby violates the Supremacy Clause to the U.S. Constitution, Art. VI, cl. 2.  The Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)).   Thus, the plaintiffs claim under the Supremacy Clause is not likely to succeed on its merits.

---

[3] Nevertheless, under the First Circuit's precedent in *Mills* regarding Maine's healthcare worker vaccine requirement, the Regulation here, too, would meet the more exacting strict scrutiny test.  *See* 16 F.4th at 32-35.

The plaintiffs further argue that the November 5, 2021, Center for Medicare & Medicaid Services ("CMS") interim final rule with comment period ("IFC"), which mandates COVID-19 vaccines for health care providers who receive Medicare and/or Medicaid funding, preempts the Regulation.[4] *See* 86 Fed. Reg. 61555 (Nov. 5, 2021). The CMS IFC allows for both medical and religious exemptions. Specifically, the plaintiffs point to the following language: "this IFC preempts the applicability of any State or local law providing for exemptions to the extent such law provides broader exemptions than provided for by Federal law and are inconsistent with this IFC." *Id.* at 61572.

The Court interprets this language as precluding a broader exemption than the IFC, which provides that health care employers must make accommodations for an individual seeking an exemption including religious exemptions. But, as described in more detail below, nothing in the Regulation precludes an employer from making an accommodation consistent with Title VII of the Civil Rights Act, provided it can do so without an undue hardship.

Turning to the plaintiffs' argument that Title VII itself preempts the regulation, that statute forbids an employer "to discriminate against, any individual because of his . . . religion." 42 U.S.C.A. § 2000e-2(c)(1). Title VII requires that employers "offer a reasonable accommodation to resolve a conflict between an

---

[4] It is unclear if the CMS regulation applies to any these currently anonymous plaintiffs as the record does not indicate if they all work in facilities that receive the requisite funding.

employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

The plaintiffs have not joined any employers to this action.  Instead, the plaintiffs argue that the Regulation is preempted by Title VII.  Federal law preempts state law (1) where Congress "preempt[s] state law by so stating in express terms"; (2) where "the scheme of federal regulation is sufficiently comprehensive to make the reasonable inference that Congress 'left no room' for supplementary state regulation"; and (3) only where there is an actual conflict between the two because compliance with both is "a physical impossibility" or because state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

Importantly, the Supreme Court has emphasized that there is a strong presumption that "state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cty., Fla.* v. *Automated Med. Lab's, Inc.*, 471 U.S. 707, 715 (1985).  Federal preemption of a state health and safety regulation will be found only in situations where it is "the clear and manifest purpose of Congress." *CSX Transp., Inc.* v. *Easterwood*, 507 U.S. 658, 664 (1993) (courts "interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption.").

Preemption can be either by an express provision of a statute or conflict preemption.  "Express preemption occurs when Congress (or an agency) enacts a

22

statute (or a regulation) 'containing an express preemption provision.'" *Estes v. ECMC Grp., Inc.*, 2021 U.S. Dist. LEXIS 138180, *39-40, 2021 DNH 117, 2021 WL 3146240 (D.N.H. July 26, 2021). Title VII clearly does not expressly preempt state public-health regulations and the plaintiffs have not argued otherwise. Instead, they argue that Rhode Island's Regulation "directly interferes with Plaintiffs' federal-law rights under Title VII." (ECF No. 2 at 4). While the plaintiffs argue that the Regulation "outright forbids Plaintiffs from even seeking (or retaining already granted) reasonable accommodations from Covid-19 vaccination in accord with their sincerely held religious beliefs" (ECF No. 2 at 5-6) that is not an accurate reading of the text of the Regulation or the record in this case. Nothing in the language prevents any employer from providing a reasonable accommodation to an employee who seeks one in accord with their sincerely held religious beliefs. Indeed, the Regulation is silent on the issue of religious exemptions.

Title VII requires employers to accommodate religious beliefs, practices, or observances only to the extent that doing so would not impose "undue hardship" on the employer. *See* 42 U.S.C. § 2000e(j)a. While the Regulation may make it more difficult for employers to accommodate religious objections; it does not create a "physical impossibility." An unvaccinated health care worker without the limited medical exemption may not enter a health care facility, but an employer may "consider alternative work-conditions, such as telemedicine." (ECF No. 16-1 ¶ 14).

The plaintiffs have presented an RIDOH Notice of Violation and Compliance Order to a hospital in support of their argument that accommodations are impossible

for those declining the vaccine due to purported religious beliefs.  (ECF No. 20.)  In at least one instance, the health care facility, response to the Notice of Violation, determined the employee's duties could not be performed off site and he or she was placed on administrative leave.  *Id.*  What this indicates is that in some cases, due to the need to limit the number of unvaccinated persons in a health care facility, accommodation is not possible without an undue hardship on the employer.  As the First Circuit held regarding Maine's COVID-19 vaccine requirement, "[t]he hospitals need not provide the exemption the appellants request because doing so would cause them to suffer undue hardship."  *Mills*, 16 F.4th at 36. *See also Cloutier v. Costco Wholesale*, 311 F. Supp. 2d 190, 198 (D. Mass. 2004), *aff'd*, 390 F.3d 126 (1st Cir. 2004) ("[T]he accommodation offered by the employer does not have to be the best accommodation possible, and the employer does not have to demonstrate that alternative accommodations would be worse or impose an undue hardship.").  Therefore, the plaintiffs have failed to make out a case of likelihood of success on the merits on their Title VII claim.

Because the Plaintiffs have failed to establish a likelihood of success on the merits as to any of their claims, the Court does not need to address the remaining factors for injunctive relief.  *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).

## V.   CONCLUSION

For the foregoing reasons, the plaintiffs have not established they are likely to succeed on the merits of their claims that the Regulation violates their constitutional

or statutory rights.   The Court therefore will not enjoin the enforcement of the Regulation.   The plaintiffs' Motion for a Preliminary Injunction (ECF No. 2.) is DENIED.


IT IS SO ORDERED.

_____

Mary S. McElroy
United States District Judge
January 7, 2022